UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                               :

MYLES STRAKER,                                    :

                              Petitioner,      :                13 Civ. 6915 (PAE)

                                                 :               OPINION & ORDER

                  -v-                            :

                                                   :

KENNETH T. JONES, in his official capacity as       :
Undersheriff and Acting Administrator of Orange County   :
Correctional Facility; CHRISTOPHER SHANAHAN, in    :
his official capacity as New York Field Office Director for :
U.S. Immigration and Customs Enforcement; RAND     :
BEERS, in his official capacity as Acting Secretary of     :
Homeland Security; ERIC HOLDER, in his official       :
capacity as the Attorney General of the United States; and :
the U.S. DEPARTMENT OF HOMELAND SECURITY,   :
                                                   :

                              Respondents.   :

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Myles Straker, an alien, is currently detained in a New York State prison pursuant to a

detainer issued by the Department of Homeland Security ("DHS") while proceedings to remove

him from the United States are underway.  DHS[1] asserts that it has the authority (indeed, the

duty) to detain him under the mandatory detention statute, § 236(c) of the Immigration and

---

[1] It is undisputed that Straker is presently being held at the direction of DHS, which contends that
his detention is mandatory pursuant to 8 U.S.C. § 1226(c).  The parties agree that Kenneth T.
Jones, Acting Administrator of the Orange County Correctional Facility, where Straker is held,
Pet. ¶ 9, is a proper respondent in this habeas proceeding; they disagree whether the federal
respondents are properly sued in habeas.  Gov. Br. 1 n.1; Straker Reply Br. 1 n.1.  DHS is,
however, defending this matter on behalf of all respondents, and it has not argued that dismissal
of the other respondents would obviate the need to resolve the merits issue presented: whether
Straker is properly held pursuant to 8 U.S.C. § 1226(c), which does not provide for a bond
hearing.  The Court accordingly declines to determine which additional respondents are properly
sued, and refers to respondents collectively as "DHS."

Nationality Act ("INA"), 8 U.S.C. § 1226(c), which applies to certain criminal aliens.[2]  Straker argues that the mandatory detention statute does not apply to him, and that DHS's only authority to detain him is a separate provision, 8 U.S.C. § 1226(a), under which he is entitled to a bond hearing.  Straker petitions for a writ of habeas corpus ordering respondents to provide him with a bond hearing.

For the reasons that follow, Straker's petition is granted.  Respondents are ordered to provide Straker with a bond hearing by December 20, 2013.

## I.  Background

### A.  Straker's Citizenship and Immigration Status

Straker was born in 1986 in Trinidad, where he lived with his grandparents until the age of 13.  Petition for Writ of Habeas Corpus (Dkt. 1) ("Pet.") ¶ 21; *id.* Ex. D.  In 2000, his grandparents sent him to live with his mother in the United States; he was lawfully admitted.  *Id.* ¶ 21.  Since then, apart from periodic visits to Trinidad, he has lived in Brooklyn.  He most recently visited Trinidad in 2007.  *Id.*  After that visit, the Government states, he returned to the United States on a visitor's visa, which has since expired.  Respondent's Memorandum of Law in Opposition to the Petition for a Writ of Habeas Corpus ("Gov. Br.") (Dkt. 16) at 1; Return to Habeas Petition ("Ret.") (Dkt. 15) Ex. 1.

### B.  Straker's Criminal History

On October 25, 2008, Straker was arrested on narcotics charges, detained for several hours, and released on his own recognizance.  Pet. ¶ 24; Pet. Ex. 1-K; Ret. Ex. 2; 11/22/13 Tr. 3.  On December 16, 2008, Straker pled guilty in New York State court to Criminal Possession of a Controlled Substance (crack cocaine) in the Seventh Degree, N.Y.P.L. § 220.03, a misdemeanor.

---

[2] The mandatory detention statute was passed by Congress as § 236(c) of the INA and is codified at 8 U.S.C. § 1226(c).  For ease of reference, the Court cites it as § 1226(c).

Pet. ¶ 24; Pet. Ex. 1-K; Ret. Ex. 2.  That same day, he was sentenced to a conditional discharge and to five days of community service.  Pet. Ex. 1-K; Ret. Ex. 2.  His driver's license was also suspended for six months.  Pet. Ex. 1-K; Ret. Ex. 2.

On February 27, 2009, Straker was again arrested on narcotics charges, detained for several hours, and released on his own recognizance.  Pet. ¶ 24; Pet. Ex. 1-K; Ret. Ex. 3; 11/22/13 Tr. 5–6.  On July 13, 2009, Straker pled guilty in New York state court to Criminal Sale of a Controlled Substance (crack cocaine) in the Third Degree, N.Y.P.L. § 220.39.01, a felony.  Pet. ¶ 24; Pet. Ex. 1-K; Ret. Ex. 3.  On September 17, 2009, he was sentenced to a five-year term of probation; his driver's license was also suspended.  Pet. ¶ 24; Pet. Ex. 1-K; Ret. Ex. 3; 11/22/13 Tr. 6–7.  On August 7, 2012, Straker was discharged, two years early, from probation.  Pet. Ex. 1-G, 1-K; Ret. Ex. 3.[3]

On December 28, 2012, Straker was arrested by local authorities in Brooklyn, New York, for a domestic dispute.  Dkt. 26 ("Mitchell Decl.") ¶ 3; *see also* Ret. Ex. 1, Tr. 7.  On December 29, 2012, he was arraigned and taken into custody.  Ret. Ex. 1.  Immigration and Customs Enforcement ("ICE") records reflect that he was charged with four misdemeanors: Menacing in the Second Degree with a Weapon, Assault in the Third Degree with Intent to Cause Physical Injury, Criminal Possession of a Weapon in the Fourth Degree with Intent to Use, and Menacing in the Third Degree; and one violation, Harassment in the Second Degree.  *Id.*  By the time of his arraignment, DHS had lodged a detainer with the Brooklyn Central Booking office of the New York City Police Department ("NYPD"), *see* Mitchell Decl. ¶ 3, Ret. Ex. 1, which notified the NYPD that, once it ceased to hold Straker on criminal charges, ICE intended to assume custody

---

[3] Explaining the early termination of probation, Straker represents that after this arrest, he attempted to turn his life around, including enrolling in GED classes, gaining employment, and moving in with his girlfriend.  Pet. ¶¶ 26–34.  In 2011, his girlfriend gave birth to their daughter, Malaysia, *id.* Ex. I, for whom Straker has been a primary caregiver.  *Id.* ¶¶ 29, 34–35.

of him, and requested that the NYPD advise ICE if it planned to release Straker, to enable DHS

to assume custody, *see* 8 C.F.R. § 287.7.  At arraignment, bail was set at $250.  Mitchell Decl.

¶ 5.  Between December 29, 2012, and May 15, 2013, Straker was held on bail in state criminal

custody at Rikers Island.  *Id.* ¶ 6.  On May 15, 2013, the criminal charges against Straker were

dropped pursuant to New York's speedy trial statute, N.Y. Crim. Procedure Law § 30.30, after

the prosecution indicated that it was not prepared to pursue the case.  Mitchell Decl. ¶ 8.

### C.  The Removal Proceedings

On December 31, 2012, two days after Straker's arraignment, ICE initiated removal

proceedings against him by issuing a Notice to Appear ("NTA").  Ret. Ex. 4.  ICE contended that

Straker was removable because he had (1) overstayed his visa and (2) committed the two drug

offenses.  Ret. Ex. 1.

Between May 15, 2013, after the domestic-dispute charges against Straker were dropped,

and May 16, 2013, Straker was held in state criminal custody pursuant to the ICE detainer.

Mitchell Decl. ¶ 9.  On May 16, 2013, ICE took Straker into custody, *id.*, served him with the

Notice to Appear, Ret. Ex. 4, and determined that he was subject to mandatory detention under 8

U.S.C. § 1226(c); *see* Ret. Ex. 5.  Straker, who to that point had been housed at Rikers Island,

was thereafter transferred to the Orange County Correctional Facility, where he is presently

detained by ICE.  Dkt. 25; Pet. ¶ 9.

Straker is presently the subject of removal proceedings pending before Immigration

Judge Alan Page.  Pet. ¶ 35.  At a hearing held August 16, 2013, Straker, who is represented by

counsel, disputed that his 2009 conviction was an aggravated felony requiring removal.  Judge

Page rejected that claim.  Pet. Ex. 3 ("Vendzules Decl.") ¶ 9.[4]  Straker is now pressing a range of other claims in the removal proceedings.  These include for asylum, withholding of removal, and voluntary departure.  He also argues that the Convention Against Torture prohibits his removal, because if removed to Trinidad he would face government-sanctioned violence and be victimized.  *Id.* ¶¶ 10, 12.[5]  Straker has also sought a U Visa, in connection with his assistance to law enforcement in connection with a violent stabbing of him in 2009; the NYPD, however, has declined his U Visa certification request.  *Id.* ¶ 11.  Finally, in state court, Straker is collaterally challenging his 2009 conviction that is a basis for the present removal proceedings.  *Id.* ¶ 14.

On August 1, 2013, Straker requested, in Immigration Court, a hearing to challenge his mandatory detention classification under *Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999) (allowing an alien to seek from an Immigration Judge a judgment of whether the alien is properly classified as subject to mandatory detention).  Straker contended that he was entitled to a bond

---

[4] DHS asserted in the NTA that Straker was removable because, *inter alia*, his 2009 conviction for criminal sale of a controlled substance in the third degree, N.Y.P.L. § 220.39.01, qualified as an aggravated felony, in that it constituted "illicit trafficking in a controlled substance."  *See* 8 U.S.C. § 1101(a)(43) (definition of aggravated felony).  Before Judge Page, Straker appears to have argued that the New York State offense of criminal sale of a controlled substance does not categorically constitute "illicit trafficking in a controlled substance," as required for it to qualify as an aggravated felony under the INA.  *See* Vendzules Decl. ¶ 9.  Straker relied on *United States v. Savage*, 542 F.3d 959, 965–66 (2d Cir. 2008), which held that the Connecticut offense of sale of a controlled substance does not categorically qualify as a "controlled substance offense" under the United States Sentencing Guidelines, because "[u]nder Connecticut law, the statutory definition of 'sale' as applied to illegal drug transactions is much broader than the common definition of a sale as an 'exchange of an object for value.'"  *Id.* at 965 (citations omitted).  In *Savage*, the Second Circuit noted that that Connecticut statute "criminalizes, *inter alia*, a mere offer to sell a controlled substance" and contains "no requirement that one be in possession of goods or have control over them in order to sell them."  *Id.*  Judge Page, however, held that the Connecticut statute was distinguishable, and that the characterization under the INA of Straker's 2009 conviction, under New York law, was governed by *Pascual v. Holder*, 707 F.3d 403, 404–405 (2d Cir. 2013).  *Pascual* holds that "a conviction under N.Y.P.L. § 220.39, a Class B felony, constitutes an aggravated felony conviction."  *Id.* at 404.

[5] Straker represents that his brother "was violently assaulted upon his return to Trinidad and Tobago and [he] fears the same will happen to him."  Vendzules Decl. ¶ 12.

hearing.  Vendzules Decl. ¶ 8.  On August 27, 2013, Judge Page held the *Joseph* hearing.  *Id.*

¶ 11.  In arguing that he was not subject to mandatory detention, Straker argued he had not been

detained at the moment "when [he had been] released," *see* 8 U.S.C. § 1226(c), from criminal

custody, as, he contended, is required under that statute.  Judge Page rejected this claim.  Ret. Ex.

7.  In an oral decision, he stated that he was bound to follow the Board of Immigration Appeals'

decisions construing 8 U.S.C. § 1226(c), under which an alien released from criminal custody for

an enumerated felony is subject to mandatory detention regardless of whether ICE took the alien

into custody immediately upon release from that custody or at a later point.  Vendzules Decl.

¶ 11.  Judge Page noted that the Second Circuit has not ruled on that question.  *Id.*

### D.  Straker's Petition for a Writ of Habeas Corpus

On September 30, 2013, Straker filed a petition for a writ of habeas corpus with this

Court.  Reprising his argument before Judge Page, he primarily claims that he is entitled to a

bond hearing because the mandatory detention statute does not apply in his case.  Dkt. 1.  On

October 1, 2013, the Court held a telephone conference with the parties and set an expedited

briefing schedule.[6]  On October 2, 2013, Straker filed a memorandum of law in support of his

petition.  Dkt. 10 ("Straker Br.") (originally filed as Dkt. 7).  On November 7, 2013, respondents

filed an opposition.  Dkt. 16 ("Gov. Br.") (originally filed as Dkt. 15).  On November 12, 2013,

Straker replied.  Dkt. 17 ("Straker Reply Br.").  On November 22, 2013, the Court held

argument.

---

[6] Consistent with the district-wide stay issued that day by Chief Judge Preska, entitled "In re Stay of Certain Civil Cases Pending the Restoration of Department of Justice Funding," the Court held that the Government's briefing deadline would be triggered by restoration of government funding.   The Assistant United States Attorneys assigned to this matter had represented that, pending that restoration, they were prohibited from returning to work.  Dkt. 4.

## II.     Jurisdiction

This Court has subject matter jurisdiction to hear Straker's petition for a writ of habeas corpus under 28 U.S.C. § 2241(c)(3).  The Court is not deprived of jurisdiction by 8 U.S.C. § 1226(e), which prohibits judicial review of "[t]he Attorney General's discretionary judgment" regarding "the detention or release of any alien or the grant, revocation, or denial of bond or parole."  That is because the issue presented by Straker's petition is the construction of the mandatory detention statute, not a discretionary decision whether or not to grant release on a bond.  *See, e.g.*, *Garcia v. Shanahan*, 615 F. Supp. 2d 175, 179 (S.D.N.Y. 2009)  ("While the Immigration and Nationality Act . . . precludes review of the 'Attorney General's discretionary judgment' with regard to 'detention or release of any alien or the grant, revocation, or denial of bond or parole,' 8 U.S.C. § 1226(e), the United States Supreme Court rejected the contention that § 1226(e) deprives courts of jurisdiction to consider challenges to the interpretation of the mandatory detention statute.") (citing *Demore v. Kim*, 538 U.S. 510, 517–518 (2003)); *Monestime v. Reilly*, 704 F. Supp. 2d 453, 456 (S.D.N.Y. 2010) ("[A] district court may review challenges to removal detention based on questions of statutory interpretation or constitutional challenges to the statutory framework."); *see also Henderson v. I.N.S.*, 157 F.3d 106, 119–22 (2d Cir. 1998) (habeas review extends to statutory questions in context of removal).

## III.     Discussion

This case calls for the Court to construe the meaning of a single clause within 8 U.S.C. § 1226(c).  The Court refers to this clause, which reads "when the alien is released," as the "when released" clause.  Straker's petition raises two issues about the meaning of this clause: what the word "when" means, and what the word "released" means.  The first issue has been the subject of extensive litigation in the federal courts; the second, less so.

By way of background, federal law contains two distinct provisions governing an alien's detention while removal proceedings are pending. Section 1226(a) allows federal immigration authorities to detain an alien during removal proceedings, subject to a bond hearing. 8 U.S.C. § 1226(a). Section 1226(c), entitled "Detention of criminal aliens," however, provides for mandatory detention of certain criminal aliens. Immigration authorities may not provide such aliens with a bond hearing. They may release such aliens only for limited purposes not relevant here, relating to the alien's service as a testifying or cooperating witness. *Id.* § 1226(c)(2).

Section 1226(c) – with the "when released" clause highlighted – reads in full:

(c) Detention of criminal aliens

    (1) Custody

    The Attorney General shall take into custody any alien who--

        (A) is inadmissible by reason of having committed any offense covered in § 1182(a)(2) of this title,

        (B) is deportable by reason of having committed any offense covered in § 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

        (C) is deportable under § 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentenced to a term of imprisonment of at least 1 year, or

        (D) is inadmissible under § 1182(a)(3)(B) of this title or deportable under § 1227(a)(4)(B) of this title,

*when the alien is released*, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

    (2) Release

    The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to § 3521 of Title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or

> person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

*Id.* (emphasis added). Originally, the authority and duties imposed by § 1226(c) were those of the Attorney General; today, they belong to DHS. *See* 6 U.S.C. §§ 202, 251, 557; *Vasquez v. Holder*, 602 F.3d 1003, 1006 (9th Cir. 2010) ("Effective March 1, 2003, the Immigration and Naturalization Service (INS), under the direction of the Attorney General, ceased to exist and its functions were transferred to the Department of Homeland Security (DHS).") (citing Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135 (Nov. 25, 2002)); *United States v. Rios–Zamora*, 153 F. App'x 517, 520–21 (10th Cir. 2005) ("With the transfer of authority under [6 U.S.C.] § 557, as of March 1, 2003, the title 'Attorney General' is synonymous with the Secretary of Homeland Security.").

### A. The Meaning of "When"

Straker's first argument is that the phrase "[DHS] shall take into custody any alien who [meets the requirements of one of subsections (A) through D)] *when* the alien is released," § 1226(c) (emphasis added), imposes on DHS a deadline within which it must act to exercise its mandatory detention authority. He construes the word "when" to mean that DHS can subject an alien to mandatory detention only if it detains him at, or around, the time he is released from criminal custody for the removable offense. Straker Br. 7–18. If, however, DHS waits to detain the alien, the statutory basis for mandatory detention evaporates. This construction of "when"— which the Court refers to as the "time-limiting" construction—would place Straker outside the reach of the mandatory detention statute. That is because his two qualifying convictions (for possession of crack cocaine, in 2008, and for sale of crack cocaine, in 2009) resulted in

noncustodial sentences that were completed long before DHS assumed custody of Straker in 2013.

Although no federal appellate court has adopted this construction, a number of courts in this District have adopted it. *See Jean v. Orsino*, No. 11 Civ. 3682 (LTS) (S.D.N.Y. June 30, 2011) (oral decision attached as Appendix A to Straker Br.); *Aparicio v. Muller*, No. 11 Civ. 0437 (RJH) (S.D.N.Y. April 7, 2011) (same); *Louisaire v. Muller*, 758 F. Supp. 2d 229, 236 (S.D.N.Y. 2010); *Monestime v. Reilly*, 704 F. Supp. 2d 453, 458 (S.D.N.Y. 2010); *Garcia v. Shanahan*, 615 F. Supp. 2d 175, 182 (S.D.N.Y. 2009). So have a number of district courts elsewhere. *See, e.g.*, *Castaneda v. Souza*, No. 13–10874–WGY, 2013 WL 3353747, at *8 (D. Mass. July 3, 2013); *Gomez-Ramirez v. Asher*, No. C13–196–RAJ, 2013 WL 2458756, at *3 (W.D. Wash. June 5, 2013); *Bacquera v. Longshore*, No. 13–cv–00543–RM–MEH, 2013 WL 2458756, at *4 (D. Colo. June 4, 2013); *Deluis-Morelos v. ICE Field Office Dir.*, No. 12CV–1905JLR, 2013 WL 1914390, at *5 (W.D. Wash. May 8, 2013); *Dighero-Castaneda v. Napolitano*, No. 2:12–cv–2367 DAD, 2013 WL 1091230, at *7 (E.D. Cal. Mar. 15, 2013); *Bogarin-Flores v. Napolitano*, No. 12cv0399 JAH (WMC), 2012 WL 3283287, at *3 (S.D. Cal. Aug. 10, 2012); *Ortiz v. Holder*, No. 2:11CV1146 DAK, 2012 WL 893154, at *3 (D. Utah Mar. 14, 2012); *Khodr v. Adduci*, 697 F. Supp. 2d 774 (E.D. Mich. 2010); *Scarlett v. U.S. Dep't of Homeland Sec.*, 632 F. Supp. 2d 214, 219 (W.D.N.Y. 2009); *Zabadi v. Chertoff*, No. C 05-03335, 2005 WL 3157377 (N.D. Cal. Nov. 22, 2005); *Quezada-Bucio v. Ridge*, 317 F. Supp. 2d 1221 (W.D. Wash. 2004).

DHS reads the word "when" differently—as creating a pre-condition for DHS to exercise its mandatory detention authority, but not as setting a deadline for its use. This interpretation was adopted by the BIA in *Matter of Rojas*, 23 I. & N. Dec. 117 (BIA 2001). There, the BIA

held that "this statutory language impose[s] a duty on the Service to assume the custody of certain criminal aliens and specifie[s] the point in time at which that duty arises." *Id.* at 121 (citations omitted).  The BIA further explained that the "when released" clause "modif[ies] the command that the Attorney General [now DHS] shall take into custody certain criminal aliens by specifying that it be done when the alien is released from criminal incarceration." *Id.*  Under this interpretation, the "when released" clause does not place an expiration date on DHS's duty under § 1226(c); if an alien who meets the requirements of § 1226(c) is released from criminal custody and DHS does not immediately take him into immigration custody, DHS continues to have the duty, and therefore the authority, to take that alien into custody.

The Court refers to this as the "duty-triggering" construction of the "when released" clause.  Both federal courts of appeals to consider this question have adopted this construction. *See Sylvain v. Attorney Gen. of U.S.*, 714 F.3d 150, 156–61 (3d Cir. 2013); *Hosh v. Lucero*, 680 F.3d 375, 378–84 (4th Cir. 2012).  So have numerous courts in this District, *see Johnson v. Orsino*, 942 F. Supp. 2d 396 (S.D.N.Y. 2013); *Santana v. Muller*, No. 12 Civ. 430 (PAC), 2012 WL 951768, at *4 (S.D.N.Y. Mar. 21 2012); *Guillaume v. Muller*, No. 11 Civ. 8819 (TPG), 2012 WL 383939, at *4 (S.D.N.Y. Feb. 7, 2012); *Mendoza v. Muller*, No. 11 Civ. 7857 (RJS), 2012 WL 252188, at *3 (S.D.N.Y. Jan. 25, 2012); *Gomez v. Napolitano*, No. 11 Civ. 1350 (JSR), 2011 WL 2224768, at *3 (S.D.N.Y. May 31, 2011); *Sulayao v. Shanahan*, No. 09 Civ. 7347(PKC), 2009 WL 3003188, at *5 (S.D.N.Y. Sept. 15, 2009), and outside of it, *see, e.g.*, *Cisneros v. Napolitano*, Civil No. 13-700 (JNE/JJK), 2013 WL 3353939, at *1 (D. Minn. July 3, 2013) (adopting report and recommendation); *Silent v. Holder*, No. 4:12-cv-00075-IPJ-HGD, 2012 WL 4735574, at *2 (N.D. Ala. Sept. 27, 2012); *Khetani v. Petty*, No. 12-0215-CV-W-ODS, 2012 WL

1428927, at *2 (W.D. Mo. Apr. 24, 2012); *Garcia Valles v. Rawson*, No. 11-C-0811, 2011 WL
4729833 (E.D. Wis. Oct. 7, 2011).

As a matter of textual interpretation, although neither reading is conclusive, the Court
finds DHS's reading (that the word "when" triggers its duty and authority to pursue mandatory
detention) more persuasive than Straker's (under which DHS's authority to achieve mandatory
deportation exists only where it takes the alien into custody immediately upon an alien's release).
Section 1226(c)(1) does not expressly put a time limit on DHS's mandatory detention authority.
There were ready ways for Congress to set an outside deadline on agency action:  Had Congress
so intended, it could have given DHS a timetable to effect a mandatory detention after the alien's
release.  Congress did not do so.  It did not state that DHS loses that authority if it delays to act.
*See Sylvain*, 714 F.3d at 156–157.  And the word "when" is an awkward, unfamiliar locution to
use to set a time limit.  It is also unhelpfully imprecise as to what that time limit is:  Unless read
to mean that DHS's detention must commence instantaneously upon the alien's release from
criminal custody, the deadline set by "when" is nebulous.  Is DHS detention too late to qualify as
mandatory detention under § 1226(c)(1) if it occurs 10 minutes after the alien's release from
criminal custody?  An hour?  A day?  A week?  Finally, Straker's construction is problematic
because it is in tension with Congress's purpose.  Section 1226(c) reflected an evident
congressional intent that aliens who had committed certain aggravated felonies merited
mandatory custody.  *See Demore*, 538 U.S. at 519 (§ 1226(c) reflected Congress's frustration
with INS's "failure to detain [criminal] aliens during their deportation proceedings").  That DHS
failed to take a particular aggravated felon into immigration detention instantaneously upon
release—because, for example, of a snafu by criminal or immigration authorities—does not
make that felon any less worthy of mandatory immigration detention pending the outcome of

removal proceeding. *See Rojas*, 23 I. & N. Dec. at 128 (Moscato, concurring) ("It is difficult to conclude that Congress meant to premise the success of its mandatory detention scheme on the capacity of the Service to appear at the jailhouse door to take custody of an alien at the precise moment of release.").

To find for DHS on the proper meaning of the word "when," however, the Court need not rely on an assessment that DHS's construction is superior to Straker's.  At best for Straker, the term "when released" is ambiguous as to whether DHS's obligation to detain the alien is limited to the instant of, as opposed to triggered by, the alien's release from criminal custody.  And the latter interpretation, DHS's, was adopted by the BIA in *Rojas*.  Accordingly, the Court must defer to DHS's interpretation of the statute, if deemed ambiguous, if it is a reasonable agency interpretation of an ambiguous statute.  *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  That was the basis upon which the Fourth Circuit ruled for DHS on this point, *see Hosh*, 680 F.3d at 378–84, and was also the basis for the similar holdings of the district courts listed above.

Under *Chevron* and its progeny, "where a statute's plain terms admit of two or more reasonable ordinary usages, the [responsible agency's] choice of one of them is entitled to deference."  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 989 (2005).  The courts to hold for DHS on the basis of *Chevron* have stated that the duty-triggering interpretation offered by the Government and the time-limiting interpretation offered by Straker are both "reasonable ordinary usages" of the statutory phrase "when the alien is released."  In favor of Straker's interpretation, the word "when" "can be read to refer to action or activity occurring 'at the time that' or 'as soon as' other action has ceased or begun."  *Hosh*, 680 F.3d at 379 (quoting 20 *The Oxford English Dictionary* 209 (2d ed. 1989); *The American Heritage*

13

*Dictionary of the English Language* (4th ed. 2000)) (other citations omitted).  In favor of the Government's interpretation, it is also a "reasonable ordinary usage" for the word "when" to refer to a duty that, although arising "at the time that," continues forward.  For example, if a person lends a book to a friend and asks her to "return the book when you finish reading it," the borrowing friend's duty to return the book arises once she finishes reading the book.  It does not evaporate if she fails to promptly return it.

The Court has carefully considered the reasoning of the courts to conclude that Straker's time-limiting construction is superior.  Such courts have commonly reasoned that "[t]he clear purpose of § 1226(c)(1) is to authorize the mandatory detention of immigrants who have committed offenses enumerated within § 1226(c)(1)(A)–(D) *immediately* upon their release from criminal sentences for those *same offenses*."  *Louisaire*, 758 F. Supp. 2d at 236 (emphases in original).  These courts have stated that (1) the word "when" naturally implies immediacy or a contemporaneous relationship between two events, so that the phrase "when . . . released" naturally means "immediately upon release"; and (2) reading "when . . . released" to mean "whenever . . . the alien has been released" would mean that any alien who has committed a listed offense is subject to mandatory detention, making the "when released" clause superfluous. *See*, *e.g.*, *Castaneda*, 2013 WL 3353747, at *3–*12; *Aparicio*, No. 11 Civ. 0437 (RJH), at Tr. 12–13; *Waffi v. Loiselle*, 527 F. Supp. 2d 480, 488 (E.D. Va. 2007) *abrogated by Hosh*, 680 F.3d 375.

As to the first point, it is certainly true that the word "when" does connote immediacy.  But that DHS's duty to take the criminal alien into detention ripens immediately upon release does not carry the corollary that this duty vaporizes immediately thereafter if unfulfilled.  *See*, *e.g.*, *Hosh*, 680 F.3d at 379–80 ("when" "can also be read to mean the temporally broader

meaning 'at or during the time that' 'while,' or 'at any or every time that") (citations omitted).

As to the second point, construing "when released" to mean "once released" does not mean that

all such aliens are subject to mandatory detention.  The word "released" is itself a word of

limitation, as is discussed *infra*.  These arguments on behalf of the time-limiting construction

thus do not resolve any ambiguity.

Straker makes several additional arguments as to why this interpretation is the only

reasonable one.  The Court finds none persuasive.  First, he argues that § 1226(c) is an exception

to a general principle favoring bond hearings set forth in § 1226(a).  Straker Br. 12.  But that is

not necessarily so:  The statute can alternatively be read simply to set out various preconditions

for mandatory detention, without creating a presumption against it.  And even if there were a

general principle favoring bond hearings, Straker does not explain why the exception to that

principle must be comprised only of aliens whom DHS instantaneously detains following their

release from criminal custody.  Second, Straker asserts that, in providing for mandatory

detention, Congress did not have in mind aliens who had already re-integrated into the

community.  Straker Br. 12–13.  But Straker does not supply authority for this claim.  And

Straker's thesis conflicts with the Supreme Court's assessment that Congress, in § 1226(c), more

broadly aimed to remedy INS's "near-total inability to remove deportable criminal aliens."

*Demore*, 538 U.S. at 518.  Third, Straker argues that DHS's construction would produce "absurd

results," specifically, subjecting aliens long at liberty, such as himself, to mandatory detention

pending deportation.  Straker Br. 13–14.  But that that outcome may be viewed as harsh or rigid

does not make it absurd.  Immigration and deportation laws have long had features denounced as

harsh.  *See, e.g.*, *United States v. Dist. Dir. of Immigr. & Nat.*, 222 F.2d 537, 538 (2d Cir. 1955)

("Immigration proceedings are now so harsh, as a matter of law, that perhaps the usual

presumptions in favor of administrative regularity should well be mitigated somewhat to show a modicum of kindness to our hardpressed alien visitors."); *Rahman v. McElroy*, 884 F. Supp. 782, 787 (S.D.N.Y. 1995) ("While this may seem harsh, it clearly follows the immigration laws of the United States."). And it may equally be viewed as absurd to condition a detained alien's right to a bond hearing on the speed with which DHS acts to secure his detention following expiration of his criminal term. Straker's claim that harsh results were contrary to Congress's intent in passing the Illegal Immigration Reform and Immigrant Responsibility Act, Pub.L. 104-208, Div. C, 110 Stat. 3009-585, is an *ipse dixit*. It is not a substantiated argument.

Quite the contrary, the BIA's reading of § 1226(c) in *Rojas* is more consistent with the history and purpose of the mandatory detention statute, as canvassed by the Supreme Court in *Demore*. Accounting for that provision, the Supreme Court stated, "Congress adopted [§ 1226(c)] against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens." *Demore*, 538 U.S. at 518. Congress had concluded that the INS suffered from a "near-total inability to remove deportable criminal aliens," a "major cause" of which "was the agency's failure to detain those aliens during their deportation proceedings." *Id.* at 519. As the Supreme Court explained, "[t]he Attorney General at the time had broad discretion to conduct individualized bond hearings and to release criminal aliens from custody during their removal proceedings when those aliens were determined not to present an excessive flight risk or threat to society. . . . Despite this discretion to conduct bond hearings, however, in practice the INS faced severe limitations on funding and detention space, which considerations affected its release determinations. S. Rep. 104–48, at 23 ('[R]elease determinations are made by the INS in large part, according to the number of beds available in a particular region')." *Id.* And, "[o]nce released, more than 20% of deportable criminal aliens failed to appear for their

removal hearings." *Id.*  Congress was therefore, the Supreme Court summarized, "concern[ed] that, even with individualized screening, releasing deportable criminal aliens on bond would lead to an unacceptable risk of flight." *Id.* at 520.  The BIA in *Rojas* drew upon this understanding of congressional intent.  It "underst[ood], in this regard, that Congress was frustrated with the ability of aliens, and particularly criminal aliens, to avoid deportation if they were not actually in Service custody when their proceedings were completed." *Rojas*, 23 I. § N. Dec. at 122.

For these reasons, the Court defers to the BIA's interpretation of § 1226(c) in *Rojas*.  It is not only reasonable, but persuasive.  Under that interpretation, DHS's duty to detain a criminal alien who meets the requirements of § 1226(c)(1)(A–D) arises "when the alien is released."  That duty and authority does not terminate if DHS cannot, or does not, act expeditiously.

**B.  The Meaning of "Released"**

Straker alternatively argues that he was not "released" within the meaning of the statute.  DHS's duty to detain an alien under § 1226(c) arises only when the alien is "released" from custody.  Straker argues that "released" must mean release from physical custody—that is, imprisonment—pursuant to a conviction for the offense that qualifies the alien for mandatory detention under § 1226(c)(1)(A)–(D).  In Straker's case, the parties agree, he was never sentenced to, nor served, a term of imprisonment, on either his 2008 conviction for crack possession or his 2009 conviction for crack distribution.  And the arrest which led to his detainer and eventually to his ICE custody was on domestic-dispute charges that were dropped; the parties agree that the arrest on these charges cannot be the source of DHS detention authority.  Therefore, if Straker's construction of "released" is accepted, DHS never acquired the duty or authority to subject him to mandatory detention, and he is entitled to a bond hearing.

DHS reads "released" more broadly.  It makes two arguments in this direction.  First, DHS argues, "release" also applies where an alien is arrested for an offense that qualifies under § 1226(c) for mandatory detention, released from custody pending trial, and thereafter convicted. This reading, if adopted, would appear to cover Straker, because his crack convictions appear to come within § 1226(c)(1)(B),[7] and the prosecutions that led to these convictions were each initiated by an arrest.  Second, DHS argues, even where there was neither an arrest nor a prison sentence, "release" also includes the freeing of an alien defendant from non-physical restraints, *e.g.*, termination of the alien's probation term or the end of judicial supervision over his criminal case.  This reading would also cover Straker.  Therefore, on DHS's construction, Straker was "released" multiple times within the meaning of the statute, and therefore is subject to mandatory detention.  The Court addresses DHS's two theories in turn.

### 1. Does Pre-Conviction Release Following an Arrest Constitute "Release"?

DHS argues that an alien's release after an arrest made as part of the process that later leads to a qualifying conviction under §1226(c)(1)(B) is a "release" within the meaning of the statute.  But the statute's plain language makes that construction unsustainable.  In mandatory terms, the statute requires that DHS "shall take into custody any alien who . . . is deportable by reason of having committed any [covered] offense . . . *when the alien is released*."  8 U.S.C. § 1226(c)(1)(B) (emphasis added).  And the four categories of aliens listed in § 1226(c)(1)(B) all refer to aliens who have been convicted of covered offenses.  *See* 8 U.S.C. § 1227(a)(2)(A)(ii) (alien who after admission "is convicted of two or more crimes involving moral turpitude"); *id.*

---

[7] *See* § 1226(c)(1)(B) (subjecting to mandatory detention an alien who, per 8 U.S.C. § 1227(a)(2)(A)(iii), "is convicted of an aggravated felony," or, per 8 U.S.C. § 1227(a)(2)(A)(iii), "has been convicted of a violation of . . . any law . . . relating to a controlled substance"); Ret. Ex. 4 (charging Straker with having been convicted of (1) an aggravated felony, (2) an offense relating to the illicit trafficking of a controlled substance, and (3) a violation of a law or regulation relating to a controlled substance).

§ 1227(a)(2)(A)(iii) (alien who after admission "is convicted of an aggravated felony"); *id.*

§ 1277(a)(2)(B) (alien who after admission "has been convicted of a violation of … any law …

relating to a controlled substance"); *id.* § 1227(a)(2)(D) (alien who at any time "has been

convicted" of enumerated miscellaneous crimes.)

The statute's text thus naturally fits the paradigm in which the alien (1) is convicted of an

offense enumerated in § 1226(c)(1)(B), (2) serves a prison sentence for such a conviction, and

thereafter (3) is released to DHS.  But, by definition, an alien who is (1) arrested, (2) released,

and only later (3) convicted of and sentenced for a covered offense, is not and cannot be eligible

to be taken into DHS custody pursuant to the mandatory detention statute at the moment of his

release.  That is because, at that point, the alien's guilt or innocence as to the qualifying offense

remains *sub judice*.  The same analysis holds under § 1226(c)(1)(C).  An alien who is arrested

and released prior to his conviction cannot come within that provision, which provides for

mandatory detention upon release "on the basis of an offense for which the alien has been

sentenced to a term of imprisonment of at least 1 year," 8 U.S.C. § 1226(c)(1)(C), because, at

that point, no sentence has been imposed.

DHS's thesis that pre-conviction release satisfies the statute thus cannot be squared with

the statute's command that detention becomes mandatory "*when* the alien is released."[8]  For such

---

[8] Were § 1226(c)(1) limited to provisions (c)(1)(A) and (c)(1)(D), which mandate detention
based on behavior falling short of a criminal conviction, DHS's construction would appear not to
suffer from this flaw.  *See*, *e.g.*, 8 U.S.C. § 1226(c)(1)(A) (providing for mandatory detention of
aliens inadmissible under 8 U.S.C. § 1182(a)(2), which includes, *inter alia*, at 8 U.S.C.
§ 1182(a)(2)(C), "[a]ny alien who the consular officer or the Attorney General knows or has
reason to believe— (i) is or has been an illicit trafficker in any controlled substance or in any
listed chemical."); 8 U.S.C. § 1226(c)(1)(D) (providing for mandatory detention of aliens
inadmissible under 8 U.S.C. § 1182(a)(3)(B), which includes an "alien who 'has engaged in a
terrorist activity'").  But the statute is not so limited.  And in practice, subsections (B) and (C),
which require a conviction, appear to be the dominant, if not exclusive, bases on which DHS has
pursued mandatory detention.  At argument before the Second Circuit in a case regarding the

an alien, the word "released" cannot mean a "release" from pre-conviction arrest.  *See Valdez v.*
*Terry*, 874 F. Supp. 2d 1262, 1273 (D.N.M. 2012).

A construction of "released" under which a mere arrest for a qualifying offense under
§ 1226(c)(1)(B) triggers DHS's mandatory duty to detain an alien would create other discord
with the statutory framework.  Upon such an arrest, DHS would be obliged to place the alien in
immigration detention, despite the ongoing criminal proceedings.  And, under § 1226(c)(2), DHS
would ordinarily not be at liberty to release him to state or federal criminal authorities in order to
serve his criminal sentence.  *See* 8 U.S.C. § 1226(c)(2) ("The Attorney General may release an
alien described in paragraph (1) only if the Attorney General decides pursuant to § 3521 of Title
18 that release of the alien from custody is necessary to provide protection to a witness . . . .").
An alien defendant thereby might elude criminal punishment altogether, either by being DHS-
detained so as to prevent the criminal trial from commencing, or by being removed from the
United States before a criminal sentence was imposed or served.  Yet Congress clearly did not
contemplate such a windfall for alien defendants.  *See* 8 U.S.C. § 1228(a)(3) ("Nothing in this
section shall be construed as requiring the Attorney General to effect the removal of any alien
sentenced to actual incarceration, before release from the penitentiary or correctional institution
where such alien is confined."); 8 U.S.C. § 1231(a)(4)(A) (ICE "may not remove an alien who is
sentenced to imprisonment until the alien is released from imprisonment"); *cf.* Anti-Drug Abuse
Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181, former 8 U.S.C. § 1252(a)(2) (Supp. I 1989)
(the predecessor to § 1226(c), which provided that "[t]he Attorney General shall take into

---

construction of § 1226(c), DHS, referring to detention under subsections (A) and (D),
represented that "we haven't encountered one of those cases."  *Gomez v. Napolitano*, No. 11-
2682 (2d Cir. 2012) (dismissed as moot on June 5, 2012).

custody any alien convicted of an aggravated felony *upon completion of the alien's sentence for such conviction*.") (emphasis added).

To be sure, the BIA has twice rendered a contrary interpretation, to the effect that release from a pre-conviction arrest constituted a statutory "release." *See Matter of West*, 22 I. & N. Dec. 1405, 1410 (BIA 2000); *Matter of Kotliar*, 24 I. & N. Dec. 124, 125 (BIA 2007). To the extent these rulings extended to pre-conviction releases—as opposed to the post-conviction release of a defendant who had been held by criminal authorities since arrest—these interpretations are unreasonable, for the reasons stated above. *See Chevron*, 467 U.S. at 844 (requiring deference only to an agency's "reasonable interpretation"); *Valdez v. Terry*, 874 F. Supp. 2d 1262, 1273 (D.N.M. 2012) ("The Court finds that, to the extent *Matter of Kotliar* holds that an alien is subject to mandatory detention under § 1226(c) based on release from custody from an arrest preceding a conviction, this holding is contrary to the plain language of § 1227(a)(2)(A)(ii) that an alien is not deportable until he or she is convicted of two or more crimes involving moral turpitude.").

The BIA's decisions are particularly unworthy of deference, in that *West* contained little reasoning in support of its conclusion on this point, and *Kotliar* none. *See G & T Terminal Packaging Co., Inc. v. U.S. Dep't of Agric.*, 468 F.3d 86, 98 (2d Cir. 2006) (declining to "reach the question whether the Secretary's cursory treatment of the term 'reasonable cause' is still entitled to *Chevron* deference").[9] *West* instead mainly addressed a different issue—whether the statutory term "released" presupposed a physical restraint. *See infra* Section III.B.2.

---

[9] The Third Circuit has three times followed *West* and *Kotliar*, but without substantive analysis of the proposition that a pre-conviction release following an arrest is a "release" under § 1226(c). *See Desrosiers v. Hendricks*, No. 12-1053, 2013 WL 3815975, at *3 (3d Cir. July 24, 2013); *Gonzalez-Ramirez v. Sec'y of U.S. Dep't of Homeland Sec.*, No. 12-3813, 2013 WL 2934090, at *2–*3 (3d Cir. June 17, 2013); *Sylvain v. Att'y Gen. of U.S.*, 714 F.3d 150, 161 (3d Cir. 2013).

Only in two sentences at the end of its ruling did the BIA in *West* address whether a pre-conviction release following an arrest satisfied this term.  Stating that it does, *West* explained only that "[w]e find support for this interpretation in the fact that [§ 1226(c)(1)] requires detention 'when the alien is released, . . . without regard to whether the alien may be arrested . . . again for the same offense." 22 I. & N. Dec. at 1410 (ellipses in *West*) (quoting 8 U.S.C. § 1226(c)(1)).  The BIA apparently read § 1226(c) to mean that federal immigration authorities may have the duty to take an alien into mandatory detention on the basis of a release from an arrest, without a conviction, and viewed the "without regard" clause as supporting this reading, because only an alien who has not yet been convicted could be arrested again for the same offense.  In other words, according to the BIA, the "without regard" clause serves as an admonition to federal immigration authorities that their duty to take an alien into mandatory detention is not defeated by the fact that the criminal authorities may seek to "arrest[] or imprison[] [the alien] again for the same offense." 8 U.S.C. § 1226(c)(1).

The problem with this reading, as mentioned previously, is that prior to a conviction, guilt or innocence remains unresolved.  As to a mandatory detention under subsections (B) and (C), which explicitly require a conviction, this problem is fatal to the BIA's reading:  DHS cannot be obliged to take an alien into mandatory detention before the alien has definitively qualified for mandatory detention.  And the statutory clause on which *West* relied is otherwise explained.  First, some of the listed offenses in subsection (A), and all of the listed offenses in subsection (D), do not require a conviction.  *See supra,* n.7.  For example, an alien who "has engaged in a terrorist activity" is inadmissible under 8 U.S.C. § 1182(a)(3)((B), and subject to mandatory detention under § 1226(c)(1)(D), even if he has not been convicted of such conduct (presumably, the statute would require some administrative determination that he had "engaged

in a terrorist activity").  Such an alien could conceivably be subject to mandatory detention before being convicted; that is, in a situation where he might be "arrested or imprisoned again for the same offense."  Second, even subsection (B) includes a class of crimes as to which the alien may have been convicted prior to admission to the United States.  Specifically, § 1226(c)(1)(B) applies to convictions listed in 8 U.S.C. § 1227(a)(2)(D), which, unlike the other portions of 8 U.S.C. § 1227(a)(2) listed in § 1226(c)(1)(B), applies to "any alien who *at any time* has been convicted" of an enumerated offense.  Such an alien, even if prosecuted and convicted in a foreign jurisdiction, may potentially be "arrested or imprisoned" anew in the United States based on the same conduct.  These examples give meaning to the phrase "without regard to whether the alien may be arrested or imprisoned again for the same offense."  And they do so without leading, as the BIA's interpretation in *Kotliar* does, to the absurd conclusion that an alien who has not been convicted of a listed crime can be subject to mandatory detention under subsections (B) or (C), which require a conviction.  To the extent the BIA in *West* viewed the single clause in § 1226(c)(1) on which it relied as authorizing DHS to take an alien into custody upon a bare arrest for a qualifying offense, the BIA misread this provision.

The Court therefore holds that Straker's post-arrest releases, prior to each of his crack-related convictions, did not constitute a "release" within the meaning of § 1226(c)(1).  The Court therefore turns to DHS's second argument for why Straker was subject to mandatory detention without a bond hearing: that his release from probation, or court supervision, met the statutory requirement of a "release."

### 2.  Does Termination of Non-Physical Custody Constitute A "Release"?

DHS argues that the termination of non-physical custody, *e.g.*, the conclusion of judicial supervision over a defendant's case, or the end of a term of probation, is a "release" that triggers

DHS's mandatory detention obligation under § 1226(c).  Significantly, as to this point, the BIA, in *West*, construed the statutory term "released" to require release from physical restraint, and not the termination of judicial or probationary supervision; in other words, to reject DHS's present interpretation.  At argument, DHS appeared to acknowledge that deference was due to the BIA's interpretation in *West*.  The Court agrees.  Because the term "release" is ambiguous, deference is due to that reasonable agency interpretation.

"[W]here a statute's plain terms admit of two or more reasonable ordinary usages, the [responsible agency's] choice of one of them is entitled to deference."  *Brand X*, 545 U.S. at 989.  Here, the statutory term "released" can be read to refer to the termination of a physical restraint, such as imprisonment.  *See Merriam-Webster Online Dictionary*, http://www.merriam-webster.com/dictionary/release (last visited Dec. 10, 2013) (defining "release" as, *inter alia*, "to allow (a person or animal) to leave a jail, cage, prison, etc."; "to set (someone or something) free"; "to stop holding (someone or something)"; and "to set free from restraint, confinement, or servitude.").  But "released" can also refer to the termination of a non-physical restraint, such as an intangible obligation.  *See id.* (defining "release" as, *inter alia*, "to relieve from something that confines, burdens, or oppresses").  Both meanings are "reasonable ordinary usages."  Either, if adopted by the agency tasked with implementation of the statute, would merit deference. *Brand X*, 545 U.S. at 989.

Here, the BIA has determined that "released" in § 1226(c)(1) "refer[s] to the release of an alien from a restrictive form of criminal custody involving physical restraint."  *West*, 22 I. & N. Dec. at 1409.  The BIA noted that the "'when released' language of [§ 1226(c)] . . . is modified by the subsequent clause[]: 'without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned

again for the same offense.'" *Id.* at 1408.  It reasoned: "The natural reading of the words

'released on' within the context of these clauses of [§ 1226(c)(1)] suggests that Congress is

referring to the release of an alien from a restrictive form of criminal custody involving physical

restraint to a less restrictive form of criminal custody without physical restraint." *Id.* at 1408–09.

The BIA stated that its reading of "released" to connote termination of a physical restraint was

further supported by "[t]he reference in the last clause of the sentence to the possibility that the

alien may be returned to a criminal custody status involving physical restraint." *Id.* at 1409.

Further supporting this construction, the BIA noted that, throughout § 1226, "the use of

the words 'release' or 'released' . . . consistently appears to refer to a form of physical restraint."

*Id.* at 1409–10.[10]  In addition to its usage in § 1226(c), the BIA examined the "[t]he use of the

---

[10] The specific issue before the BIA in *West* was the meaning of "released" as used in a
temporary version of the mandatory detention statute: the Transition Period Custody Rules
("Transition Rules").  *See* 8 U.S.C. § 1226 note.  In 1996, Congress enacted the Illegal
Immigration Reform and Immigrant Responsibility Act, Pub.L. 104-208, Div. C, 110 Stat. 3009-
585 ("IIRIRA").  Section 303 of IIRIRA created, in § 236 of the INA (8 U.S.C. § 1226), both the
mandatory detention statute and the Transition Rules.  The latter provided for the mandatory
detention of a narrower class of aliens.  The Transition Rules were to be in effect, in lieu of the
mandatory detention statute, for one or two years, in the event the Attorney General promptly
notified Congress "that there is insufficient detention space and Immigration and Naturalization
Service personnel available" to carry out the permanent mandatory detention regime.

For two reasons, although *West* applied the Transition Rules and not the mandatory detention
statute that was to take permanent effect after the Transition Rules ceased to be in force, *West*'s
holding applies equally to the mandatory detention statute.  First, in analyzing the term
"released" in the Transition Rules, the BIA construed that term as used in the mandatory
detention statute.  The BIA concluded that "released" as used there "refer[s] to the release of an
alien from a restrictive form of criminal custody involving physical restraint."  22 I. & N. Dec. at
1409.  Second, *West* noted, "released" has the same meaning in the Transition Rules as in the
mandatory detention statute.  *See id.* at 1407–08 ("[F]ocusing its argument on the 'when
released' language of § 1226(c), the Service asserts . . . .  We assume that the Service would
make essentially the same argument regarding the "released after" language of [the Transition
Rules]."); *id.* at 1408 (referring to the identical "when released" clauses in 1226(c) and the
Transition Rules); *id.* at 1409 ("The natural reading of the words 'released on' within the context
of these clauses of § 1226(c)(1) of the Act suggests that Congress is referring to the release of an
alien from a restrictive form of criminal custody involving physical restraint to a less restrictive

term 'release' in the provisions relating to the release of an alien on an immigration bond," including § 1226(a).  In these contexts, too, the BIA concluded, "release" "obviously refers to release of the alien from the physical custody of the Service."  *Id.* at 1408.

The Government has not disputed that *West* merits deference, or claimed that *West*'s is an unreasonable construction.  At argument, the Government instead relied on a different decision, *Matter of Kotliar*, 24 I. & N. Dec. 124 (BIA 2007).  There, the respondent alien argued to the BIA that "he [was] not subject to mandatory detention because he did not serve a jail term and was apprehended from his home while on probation, rather than when he was released from criminal custody."  *Id.* at 125.  The BIA rejected that argument.  It noted that § 1226(c)(1) "states that an alien is subject to mandatory detention and shall be taken into custody when the alien is released, without regard to whether he was released 'on parole, supervised release, or probation.'"  *Id.*  On the basis of this statement, the Government asks the Court to conclude that *Kotliar*, in effect, *sub silentio* overruled *West*.

The Court disagrees.  There is undeniably some tension between the BIA's rejection of alien Kotliar's argument, and the well-developed reasoning in this portion of *West*.  *Kotliar* can be read to reflect that, contrary to *West*, when a court sentences a person to parole or probation, that person is then being "released" from the court's supervision, so as to trigger DHS's duty (and authority) to subject him to mandatory detention under § 1226(c).  But the single sentence in *Kotliar* is too insubstantial a basis on which to infer an implicit BIA rejection of *West's* explicit holding that "released" refers to a release from physical custody.  And *Kotliar* does not purport to overrule *West*; it cites to *West* just one sentence later.  *Kotliar*, 24 I. & N. Dec. at 125.

---

form of criminal custody without physical restraint."); *id.* at 1409–10 ("The use of the words 'release' or 'released' in § 303 of the IIRIRA consistently appears to refer to a form of physical restraint.").

Further, *Kotliar*'s main reason for denying the alien's challenge to his mandatory detention was *West*'s later holding that a release of a defendant who had been released following an arrest but before conviction can constitute a "release" under the mandatory detention statute. *See Kotliar*, 24 I. & N. Dec.  at 125 ("Moreover, we have held that an alien who is released from criminal custody (including from an arrest preceding a conviction, as the respondent implicitly conceded took place here) after the expiration of the Transition Period Custody Rules . . . is subject to mandatory detention pursuant to [§ 1226(c)], even if the alien is not immediately taken into custody by immigration officials when released from incarceration.").  Viewed holistically, *Kotliar* appears to conclude that an alien's release on probation does not erase the fact of a previous § 1226(c) "release," whether from a post-conviction term of imprisonment, or from a pre-conviction release from an arrest.  This Court, however, has already held that although the former (the termination of a prison sentence) would give rise to a statutory "release," the latter would not.  *See supra*; *see also Saysana v. Gillen*, 590 F.3d 7, 16 (1st Cir. 2009) ("In explaining the various passages of IIRIRA, the legislature stated that mandatory detention was meant to apply 'whenever such an alien is released from imprisonment, regardless of the circumstances of the release.'  House Conf. Rpt. No. 104–828 at 210–11 (Sept. 24, 1996).  Presumably, with that comment, the legislature was seeking to thwart arguments by aliens that because they were subject to parole or other community supervision they could not be taken into immediate immigration detention because that would result in a violation of their imposed conditions.") (quoting *Quezada–Bucio v. Ridge*, 317 F. Supp. 2d 1221, 1230 (W.D.Wash. 2004) (adopting magistrate judge's recommendation)).

The Court, accordingly, holds, in deference to the BIA's reasonable interpretation in *West*, that an alien's release from non-physical restraints such as court supervision, probation,

parole, or supervised release does not qualify as a release that triggers DHS's duty to detain an alien under any part of § 1226(c), *see West*, 22 I. & N. Dec. at 1408–10.  Under the statute, an alien's release *to* probation or supervised release, from a period of imprisonment, assuredly counts as a "release" within the meaning of the statute.  However, the cessation of such forms of supervision, where there has been no antecedent term of imprisonment from which the alien has been released, does not qualify as a "release."[11]

Straker was therefore never "released" within the meaning of § 1226(c).  His only releases from physical custody were pre-conviction releases following his two arrests for crack offenses.  And a release following an arrest, where the alien has not been convicted of the offense, does not qualify as a "release" under § 1226(c).

### 3.   Exhaustion of Administrative Remedies

In a final argument opposing Straker's petition, the Government argued that Straker had failed to exhaust his administrative remedies, because, before the Immigration Judge, he had not made the argument he makes here with regard to the term "released" within the "when released" clause. Gov. Br. 20 (citing *Howell v. I.N.S.*, 72 F.3d 288, 291 (2d Cir. 1995)).  "Under the doctrine of exhaustion of administrative remedies, 'a party may not seek federal judicial review of an adverse administrative determination until the party has first sought all possible relief within the agency itself.'"  *Howell*, 72 F.3d at 291 (quoting *Guitard v. United States Sec'y of Navy,* 967 F.2d 737, 740 (2d Cir. 1992)).  However, there are "established exceptions to the exhaustion rule," and one, futility, applies here.  *Id.*  Had Straker raised this argument before the Immigration Judge, the judge would have been bound to follow the BIA's holdings in *West* and

---

[11] The Court has no occasion here to consider how the requirement of a "release" would apply to the circumstance in which an alien was arrested, eventually released from custody on bail, later convicted, and still later sentenced to a term of time served.  On neither narcotics conviction was Straker sentenced to time served.

*Kotliar* to the effect that a pre-conviction release following an arrest satisfies the statutory release requirement. "A court rightly excuses a failure to exhaust administrative remedies when such exhaustion would be futile or where the agency has predetermined the issue before it." *Garcia v. Shanahan*, 615 F. Supp. 2d 175, 180 (S.D.N.Y. 2009) (citation omitted).

### C. Due Process and Parole

Because the Court finds for Straker on the "release" argument, it has no occasion to reach his alternative claims, *i.e.*, that his continued detention without a hearing offends due process, or that DHS may release him on parole on the basis of "urgent humanitarian reasons" or "significant public benefit" under 8 C.F.R. § 212.5(b). *See* Straker Br. 21–25.

### CONCLUSION

In sum, the Court holds that Straker, who was never sentenced to nor served any term of imprisonment, was never "released" from physical custody within the meaning of that term in § 1226(c). DHS therefore lacked the authority to detain him under that statute, the mandatory detention statute.

DHS's authority for detaining Straker during removal proceedings instead lies under § 1226(a), under which he is entitled to a bond hearing. The Court directs the Government to provide Straker with a bond hearing, consistent with § 1226(a), by December 20, 2013.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: December 10, 2013
       New York, New York

29